1
2
3
4
5

# UNITED STATES DISTRICT COURT

6

# SOUTHERN DISTRICT OF CALIFORNIA

7
8

RANDALL W. ROBINSON,

9

Plaintiff,

vs.

10

ADVANCED DECOY RESEARCH, INC.,
GEORGE BRINT, AND PANIC MOUSE,
INC.,

11
12

Defendants.

13

CASE NO. 05CV1688 BTM (CAB)

**ORDER RE: CLAIM
CONSTRUCTION**

14      Randall Robinson ("Plaintiff" or "Patentee") received U.S. Patent No. 4,930,448 ("the

15 '448 patent") on June 5, 1990, for his invention entitled "Animal Toy."  The device consists

16 primarily of a motorized mechanism by which an object rotates about a stationary base via

17 an elongate rod.  The basic idea is that an animal will be drawn to the spinning object and

18 have some sort of pleasant interaction with it.

19      On August 26, 2005, Mr. Robinson filed a complaint with this Court alleging

20 infringement of the '448 patent by Advanced Decoy Research, Inc.  On April 13, 2006,

21 Plaintiff amended his complaint to include George Brint and Panic Mouse, Inc. as additional

22 defendants.

23      Plaintiff and Defendants have filed briefs supporting their proposed constructions of

24 the claims of Patent '448.  Pursuant to Markman v. Westview Instruments, Inc., 517 U.S.

25 370 (1996), the Court must construe the claims of the '448 patent as a matter of law.   On

26 February 26, 2007, the court held a Markman hearing.  Having considered the evidence

27 presented in the parties' briefs and arguments at the hearing, the Court issues the following

28 order construing the claim language as a matter of law.

1    **I.     Legal Standard for Claim Construction**

2         To ascertain the meaning of the claims, the court initially looks to three sources of

3    intrinsic evidence: the claims, the specification, and the prosecution history.  Vitronics Corp.

4    v. Conceptronic Inc., 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("It is well-settled that, in

5    interpreting an asserted claim, the court should look first to the intrinsic evidence of record,

6    i.e., the patent itself, including the claims, the specification and, if in evidence, the

7    prosecution history.").  These sources form the public record of the patentee's claim.  Id. at

8    1583.  If the meaning of a claim is unambiguous from the intrinsic evidence, a court may not

9    rely on extrinsic evidence in construing the claim.  Key Pharms. v. Hercon Labs. Corp., 161

10   F.3d 709, 716 (Fed. Cir. 1998).

11        In construing the claims, the court first looks at the language of the claims.  Markman

12   v. Westview Instruments, Inc., 52 F.3d 967, 979 (Fed. Cir. 1995) (en banc) aff'd 517 U.S. 370

13   (1996).  There is a "heavy presumption" in favor of the ordinary and accustomed meaning

14   of claim language as understood by one of ordinary skill in the art.  Johnson Worldwide

15   Assocs., Inc. v. Zebco Corp., 175 F.3d 985, 989 (Fed. Cir. 1999); see also Phillips v. AWH

16   Corp., 415 F.3d 1303, 1312-1313 (Fed. Cir. 2005) ("We have made clear, moreover, that the

17   ordinary and customary meaning of a claim term is the meaning that the term would have to

18   a person of ordinary skill in the art in question at the time of the invention, i.e., as of the

19   effective filing date of the patent application.").  Accordingly, a technical term used in a patent

20   is usually interpreted as having the meaning a person of ordinary skill in the field of the

21   invention would have understood it to have at the time of filing.  However, a patentee is

22   entitled to "act as his own lexicographer to specifically define terms of a claim contrary to

23   their ordinary meaning."  Chef America, Inc. v. Lamb-Weston, Inc., 358 F.3d 1371, 1374

24   (Fed. Cir. 2004) (citations omitted).  In these instances, a court should construe the term as

25   defined by the patentee.  Process Control Corp. v. HydReclaim Corp., 190 F.3d 1350, 1357

26   (Fed. Cir. 1999).

27        In its initial examination of the intrinsic evidence, the court is also instructed to

28   "examine the prosecution history to determine whether the patentee has relinquished a

2

1    potential claim construction in an amendment to the claim or in an argument to overcome or

2    distinguish a reference." Bell Atlantic Network Services., Inc. v. Covad Communications

3    Group, 262 F.3d 1258, 1268 (Fed. Cir. 2001) (citing Southwall Techs., Inc. v. Cardinal IG,

4    Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("The prosecution history limits the interpretation

5    of claim terms so as to exclude any interpretation that was disclaimed during prosecution.")).

6    The prosecution history, or "file wrapper," contains the complete record of all the proceedings

7    before the United States Patent and Trademark Office ("USPTO"), including any express

8    representations made by the applicant regarding the scope of the claims. Bell Atlantic, 262

9    F.3d at 1268.  In examining the prosecution history, however, the Court cannot "enlarge,

10   diminish, or vary" the limitations of the claims. Goodyear Dental Vulcanite Co. v. Davis, 102

11   U.S. 222, 227 (1880).

12       If the meaning of the claim limitation is apparent from the intrinsic evidence alone, the

13   Court may not rely on extrinsic evidence other than that used to ascertain the ordinary

14   meaning of the claim limitation. Bell Atlantic, 262 F.3d at 1268-69.  However, in the "rare

15   circumstance" that the meaning of the asserted claims cannot be ascertained after examining

16   the intrinsic evidence, the Court may look to extrinsic evidence to help resolve any lack of

17   clarity. Id. Extrinsic evidence consists of all evidence external to the patent and prosecution

18   history and includes such evidence as expert testimony, articles, and inventor testimony.

19   Markman, 52 F.3d at 980.  It may be used only to assist the Court in determining the proper

20   understanding of the disputed limitation, rather than "to vary, contradict, expand, or limit the

21   claim language from how it is defined, even by implication, in the specification or file history."

22   Bell Atlantic, 262 F.3d at 1269.  While dictionaries fall within the category of extrinsic

23   evidence, the Court is free to consult them at any time "so long as the dictionary definition

24   does not contradict any definition found in or ascertained by a reading of the patent

25   documents." Vitronics, 90 F.3d at 1584 n.6.  Dictionaries are preferred over opinion

26   testimony because they are objective and available to the public. Id. at 1585.  This limited

27   use of extrinsic evidence comports with the principle that "[a]llowing the public record to be

28   altered or changed by extrinsic evidence . . . would make th[e] right [to design around the

claimed invention] meaningless." Id. at 1583. "Any other rule would be unfair to competitors who must be able to rely on the patent documents themselves, without consideration of expert opinion that then does not even exist, in ascertaining the scope of a patentee's right to exclude." Southwall, 54 F.3d at 1578.

## II.   Construction of the Terms of the '448 Patent: Claim 1

The Court addresses the following twelve terms of Claim 1 of the '448 patent:

> [1] **A toy device for the amusement of pet animals,** [2] **comprising:** [3] a **base member** having a [4] **lower surface for freely seating on a substantially flat surface**, the lower surface [5] **having no projections for connection** to the seating surface; an [6] **elongate, rod-like member** [7] **rotatably mounted** at one end on said base member and extending in an upwardly and [8] **radially outwardly** arched path away from said base member with its free end spaced radially outwardly from the outer [9] **periphery** of said base member; a [10] **single flexible connecting device** secured to the free end of said elongate member; an object attached to said connecting device [11] **opposite and directly below** the free end of said member; and [12] **drive means** on said base member for rotating said elongate member to move said object in a path around said base for the amusement of a pet unsecured to said base.

### A.   "**a toy device for the amusement of pet animals**"

The first disputed language, "a toy device for the amusement of pet animals," comprises the preamble of Claim 1.  As a general rule, preambles are not construed as limiting the claims except in those instances where they recite "essential structure" or where they are "necessary to give life, meaning, and vitality to the claim." Catalina Mktg. Int'l, Inc. v. Coolsavings.com, 289 F.3d 801, 808 (Fed. Cir. 2002) (citation omitted).  Thus, generally, "a preamble is not limiting where a patentee defines a structurally complete invention in the claim body and uses the preamble only to state a purpose or intended use for the invention." Id. (citation omitted).  However, a patentee's "clear reliance on the preamble during prosecution to distinguish the claimed invention from the prior art transforms the preamble into a claim limitation because such reliance indicates use of the preamble to define, in part, the claimed invention." Id.  Thus, statements of intended use may limit the claims in those instances where the patentee "clearly and unmistakably relied on those uses or benefits to distinguish prior art." Id. at 809.

1    In this instance Plaintiff clearly relied on use specified in the preamble to distinguish

2   from the Postings reference (U.S. Pat. #1,699,308) when, in a response to the USPTO

3   examiner's initial rejection, he characterized Postings as an "exercising device" and noted

4   that the device in Postings "clearly has no 'amusement' value to the animals whatsoever."

5   (Def's Ex. B at 35-36 (emphasis and quotations in original).)  Plaintiff thereby relied on the

6   "amusement" element of the preamble to define his claimed invention and to distinguish it

7   from a prior art reference.  Thus the preamble must be construed as limiting inasmuch as the

8   claim requires an element of "amusement."

9    Plaintiff argues, and at first glance it appears, that the preamble need not be

10   construed as limiting "amusement" to that of "pet animals."  In this instance, Patentee did not

11   argue during prosecution that his invention was patentably distinct from Postings based on

12   the fact that a *pet* was to be amused.  Indeed, he could not have done so because the

13   Postings reference in fact discloses a device for the exercising of a pet (a dog).  However,

14   the intended use specified in the preamble, and which the Patentee relied upon in the

15   prosecution history, is that of a "toy device for the amusement of pet animals."  Plaintiff has

16   cited no authority for the proposition that a preamble specifying the intended use of the

17   device should be dissected in the claim construction process to include only the single

18   distinguishing element.  Such a dissection would be particularly odd in this instance where

19   the remaining phrase ("for the amusement") is simply not logically cognizable without

20   reference to the "amusee."

21    In light of the foregoing analysis, the Court will construe the preamble phrase "**a toy**

22   **device for the amusement of pet animals**" as "a device for the amusement of an animal

23   kept for pleasure or companionship, rather than solely for utility."[1]

24

25

26   ───────────────

27   [1] Construction of the phrase "toy" is unnecessary as it would merely be redundant with the inclusion of "amusement."

28   American Heritage Dictionary defines "pet" as: "an animal kept for amusement or companionship." American Heritage Dictionary of the English Language, available online at http://education.yahoo.com/reference/dictionary.

05CV1688

B.  "**comprising**"

"Comprising" is a term of art in patent law which is construed to mean, as the parties stipulate, "including but not limited to."  See SanDisk Corp. v. Memorex Products, Inc., 415 F.3d 1278, 1284 (Fed. Cir. 2005).

As such, the Court construes "**comprising**" to mean "including but not limited to."

C.  "**a base member**"

Defendants cite to various other patents, which would have been prior art at the time of the '448 application, for the proposition that "base member" means "an integral support structure."  Because the patent specification is reasonably clear on the structure of this element, and owing to the general presumption in favor of construing claim terms using intrinsic evidence, reference to other patents or additional extrinsic evidence is unnecessary. See Key Pharms, 161 F.3d at 716.

Plaintiff cites to the patent specification, in particular column 2 at line 19, for the proposition that "base member" should be construed to mean a "housing."  However, that sentence states that the device "basically comprises a base _or_ housing," thereby implying that a base member is not a housing.  In addition, while the patent specification appears to use the two terms interchangeably in some places, it also clearly distinguishes between the two in others.  Compare Patent Abstract ("A toy device for a pet animal _comprises a base housing_ having an upper wall . . . .") with Column 1, Line 27 ("The _base preferably comprises a housing_ in which the rotatable member and drive assembly are mounted . . . .") (emphasis added).  Accordingly, the Court cannot find that the specification clearly defines the term "base member" as a "housing."

Rather, the implication present throughout the patent, and the Court's understanding of the plain meaning,[2] indicate that the term "**base member**" should be construed as "supporting structural unit."

---

[2] American Heritage Dictionary defines "base," as used in the context of the '448 patent, as: "a supporting part or layer; a foundation."
"Member," in this context, is defined as: "a structural unit, such as a beam or wall."

05CV1688

D. "**having a lower surface for freely seating on a substantially flat surface**"

Defendants suggest that this term should be construed to mean having a "flat lower surface that rests directly onto a flat ground surface, in contact with the surface." (Joint Claim Construction Chart ("Claims Chart"), p. 2, section 1.3.)  In support of this definition, the Defendants propose that the remainder of the phrase implies that the lower surface must be flat in order that it may "freely [sit] on a substantially flat surface."   However, the Court believes this definition overreaches, in that the lower surface need not necessarily be flat to enable it to rest on a flat surface.  The surfaces of many objects are not flat - an upturned bowl for example - yet those objects are quite capable of resting on a substantially flat surface.

Plaintiff contends that the phrase should be construed to mean that the base member is not secured to the flat surface, and cites to the prosecution history as evidence.  During prosecution, the Patentee was faced with a prior art rejection by the patent examiner, and was forced to argue around the Postings reference.  To avoid Postings, the Patentee argued both the above-mentioned "amusement" angle, as well an argument that Postings disclosed a device whereby the animal was tethered to the device and the device was secured to a surface (generally, the ground) - thus ostensibly forcing the animal to run circles around a stationary object.  In contrast, Patentee argued, his invention describes a device in which the animal is neither tethered to the device, nor is the device secured to the surface.

The Court finds Plaintiff's argument persuasive.  The prosecution history provides for a definition of the phrase which is consistent with the language of the claims, specification, and the plain meaning.[3]  As such, the Court construes **"having a lower surface for freely seating on a substantially flat surface"** to mean:  "having a lower surface that sits on, but is not secured to, a mostly flat surface."

//

//

_____

[3] American Heritage Dictionary defines "free," the root of the word "freely," as used in the context of the '448 patent, as: "not bound, fastened, or attached."

05CV1688

E. "the lower surface **having no projections for connection** to the seating surface;"

Plaintiff contends that this phrase must be construed in light of the prosecution history to mean "having no arms extend[ing] downwardly into the seating surface." (Claims Chart, p. 2, section 1.4.)  In support of this construction, Plaintiff cites to the November 20, 1989 amendment in response to the examiner's prior art rejections.  In this response, Plaintiff was forced to argue around the prior art disclosure of Postings and McMurry (U.S. Pat. # 2,831,457) when he stated: "[I]n both Postings and McMurry, the base member is physically secured to the ground surface via projections from its lower surface . . . . It therefore is not freely seated on the ground in either case. . . ." (Def's Exh. B at 37.)  In conjunction with this argument, it appears that Plaintiff amended Claim 1 to include the above language, claiming a negative element of "no projections."

The Court does not agree with Plaintiff's contention that the prosecution history should be interpreted as limiting "no projections for connection to the seating surface" to "no arms extend[ing] downwardly into the seating surface."  While Plaintiff's intention when drafting the amended claim may have been to only disclaim those projections which extended downwardly, he did not do so.  It is a fundamental axiom in patent law that a Court may not redraft a claim, via construction, to encompass what the patentee intended to claim, or could have claimed.  In a situation very similar to this one, where the patentee was relying on prosecution history to support construction of the term "permanently affixed" as meaning "affixed to prevent movement in at least a horizontal plane," the Federal Circuit stated:

> To be sure, the prosecution history indicates that the applicant intended to amend the claims to avoid the "detachable" connection of the Johnson skate. The same history, however, indicates that the applicant chose to add the term "permanently" to the claims in order to achieve this result. That the applicant could possibly have added terms other than "permanently" to create a patentable distinction with the asserted prior art is simply irrelevant to our claim construction task. Courts do not rewrite claims; instead, we give effect to the terms chosen by the patentee. See, e.g., Texas Instruments Inc. v. International Trade Comm'n, 988 F.2d 1165, 1171, 26 U.S.P.Q.2d (BNA) 1018, 1023 (Fed. Cir. 1993) ("[T]o construe the claims in the manner suggested by TI would read an express limitation out of the claims. This, we will not do because '[c]ourts can neither broaden nor narrow claims to give the patentee something different than what he has set forth'" (quoting Autogiro Co. of Am. v. United States, 181 Ct. Cl. 55, 384 F.2d 391, 396, 155 U.S.P.Q. (BNA) 697, 701 (Ct. Cl.1967).).

8

05CV1688

1  K-2 Corp. v. Salomon S.A., 191 F.3d 1356, 1364-65 (Fed. Cir. 1999).

2       Just as the court in K-2 refused to expand the scope of the phrase beyond that which

3  was claimed, so must this Court.  The distinction that the claim amendment here was a

4  negative one, or specifically negating an element of the claim, does not distinguish K-2 from

5  the present case.  In this instance, reading "downwardly" into the claim would serve to

6  expand the scope of Plaintiff's claim, because the claim would then encompass all

7  projections not protruding "downwardly" - just as reading "permanently" to mean "affixed to

8  prevent movement in at least a horizontal plane" would expand the scope of the K-2 claim

9  to include fixation in methods outside the commonly understood definition of "permanently."

10 Though a patentee is entitled to be his own lexicographer, "'the words of a claim will be given

11 their ordinary meaning, unless it appears that the inventor used them differently.'"  K-2, 191

12 F.3d at 1364 (quoting Hoganas AB v. Dresser Industries, Inc., 9 F.3d 948, 951 (Fed. Cir.

13 1993).   In this instance, Plaintiff has not demonstrated that the language used in the

14 prosecution history is sufficient to overcome the ordinary meaning of the phrase.[4]

15      As such, "the lower surface **having no projections for connection** to the seating

16 surface" shall be construed as "the lower surface having no parts extending outwardly for

17 attachment or fastening to the seating surface."

18

19      F.  "an **elongate, rod-like member**"

20      Plaintiff proposes that this phrase be construed as a "shaft having a length."  The

21 Court finds that such a construction would be unhelpful to a jury, as it remains quite vague

22 in its employment of the phrase "having a length."  Defendants' proposal of "a long, slender

23 rod-like structure" appears to be supported by the patent specification and the dictionary

24 definition of elongate,[5] and it also gives some additional definition to the phrase.  Accordingly,

25 _____

26      [4] American Heritage Dictionary defines "projection," as used in the context of the '448
   patent, as: "a thing or part that extends outward beyond a prevailing line or surface."
27      "Connect," the root of the word "connection," is defined as: "to join or fasten together."

28      [5] American Heritage Dictionary defines "elongate," as used in the context of the '448
   patent, as: "having more length than width; slender."

"an **elongate, rod-like member**" shall be construed as "a long, slender rod-like structure."

G.  "**rotatably mounted** at one end on said base member"

The parties stipulate that the term "**rotatably mounted**" means "connected such that it rotates."  The Court shall construe it as such.

H.  "extending in an upwardly and **radially outwardly** arched path away from said base member"

The parties stipulate that "**radially outwardly**" means "away from center."  The Court shall construe it as such.

I.  "with its free end spaced radially outwardly from the outer **periphery** of said base member;"

The parties stipulate that "**periphery**" means "the edge."  The Court shall construe it as such.

J.  "a single **flexible connecting device** secured to the free end of said elongate member;"

Defendants assert that the term "flexible connecting device" connotes a means-plus-function element, thereby falling within the purview of 35 U.S.C. § 112, ¶ 6, and limiting the element to structures delineated in the specification.

Under 35 U.S.C. § 112, ¶ 6, "[a]n element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof."  The statute states that these types of claims are not construed to cover all possible means for performing the stated function, but are "construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof."  35 U.S.C. § 112, ¶ 6; see O.I Corp v. Tekmar Co., 115 F.3d 1576 (Fed. Cir. 1997).

10

In identifying which claims shall be read as means-plus-function, courts have construed those claims using the term "means" as creating a rebuttable presumption that § 112 ¶ 6 applies, while not including the term "means" creates a rebuttable presumption that § 112 ¶ 6 does not apply.  Lighting World, Inc. v. Birchwood Lighting, Inc., 382 F.3d 1354, 1358 (Fed. Cir. 2004).  Thus, "[t]he use of the term 'means' is central to the analysis, because the term 'means,' particularly as used in the phrase 'means for,' is part of the classic template for functional claim elements, and has come to be closely associated with means-plus-function claiming." Id. (citations omitted).  This presumption stems largely from the idea that § 112 ¶ 6 "provides that an element in a claim for a combination 'may be expressed' as a means for performing a function, which indicates that the patentee is afforded the option of using the means-plus-function format. The question then is whether, in the selection of claim language, the patentee must be taken to have exercised that option." Greenberg v. Ethicon Endo-Surgery, Inc., 91 F.3d 1580, 1584 (Fed. Cir. 1996) (quoting § 112 ¶ 6).

The presumption against construing an element of a claim as invoking § 112 ¶ 6, absent the term "means," may be rebutted "if it is demonstrated that the claim term fails to recite sufficiently definite structure or else recites function without reciting sufficient structure for performing that function." Lighting World, 382 F.3d at 1358 (citations omitted).  However, it must be understood that the presumption against § 112 ¶ 6 treatment is "a strong one, that is not readily overcome." Id.

In Lighting World, the Federal Circuit explained the test for determining whether a claim element lacked sufficient structure, thereby overcoming the presumption.  In that case, however, the court found that the term "connector assembly" did provide sufficient structure, and thus did not fall within § 112 ¶ 6. Id. at 1360-63.  The court stated:

> In considering whether a claim term recites sufficient structure to avoid application of section 112 ¶ 6, we have not required the claim term to denote a specific structure. Instead, we have held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, even if the term covers a broad class of structures and even if the term identifies the structures by their function.

Id. at 1359-60.  The court continued: "'[T]he fact that a particular mechanism . . . is defined

in functional terms is not sufficient to convert a claim element containing that term into a 'means for performing a specified function' within the meaning of section 112(6).'" Id. at 1360 (quoting Greenberg, 91 F.3d at 1583).  In concluding that "connector assembly" did not fall within the purview of § 112 ¶ 6, the court noted:

> [W]hile it is true that the term "connector assembly" does not bring to mind a particular structure, that point is not dispositive.  What is important is whether the term is one that is understood to describe structure, as opposed to a term that is simply a nonce word or a verbal construct that is not recognized as the name of structure and is simply a substitute for the term "means for."

382 F.3d at 1360.

The Lighting World court also distinguished "connector assembly" from the "lever moving element" which was found to be means-plus-function element in Mas-Hamilton Group v. LaGard, Inc., 156 F.3d 1206 (Fed. Cir. 1998).  In Mas-Hamilton, the court found that "lever moving element" did not define structure, in that it did not have a well understood structural meaning in the art.  156 F.3d at 1213-14.  Lighting World distinguished Mas-Hamilton on the ground that "connector assembly" did in fact have an understood structural definition in the art, as defined by the patent specification, dictionaries, and expert testimony.  382 F.3d at 1363.

Conversely, in Mass. Inst. of Tech. ("MIT") v. Abacus Software, the Federal Circuit determined that the term "colorant selection mechanism" did not connote sufficient structure to a person of ordinary skill in the art to avoid § 112 ¶ 6 treatment.  462 F.3d 1344, 1354 (Fed. Cir. 2006).  In doing so, the court noted that generic structural terms such as "means," "element," or "device" do not recite sufficient structure to avoid § 112 ¶ 6, but that "[c]laim language that further defines a generic term like 'mechanism' can sometimes add sufficient structure to avoid 112 ¶ 6."  Id.  However, in that instance the Court found that the phrase "colorant selection" did not add sufficient structure to define the term "mechanism" so as to avoid § 112 ¶ 6.  Id.

In making its determination, the MIT court first looked to the prosecution history of the patent and noted that the patentee used "mechanism" and "means" as synonyms.  Id.  The

12

1   court also looked disfavorably upon the fact that the term "colorant selection," which modified

2   "mechanism," was not defined in the patent specification or in dictionaries, nor did it have a

3   generally understood meaning in the art.  Id.  The court thus found that the phrase did not

4   recite sufficient structure to one of ordinary skill in the art, and was therefore limited by § 112

5   ¶ 6.  Id.

6          In this instance, the phrase "flexible connecting device" does not fit neatly into the

7   standard means-plus-function analysis.  Obviously the phrase does not contain the term

8   "means," thus the strong presumption against § 112 ¶ 6 is applicable in this case.  However,

9   that presumption may be rebutted upon a showing of a lack of structural specificity or a

10  recital of function without reciting sufficient structure for performing that function.  Lighting

11  World, 382 F.3d at 1358.  Facially, it does not appear that the phrase "flexible connecting

12  device" connotes any particular structure, and could be interpreted as describing a device

13  according to the function that it performs.  However, it is clear that neither the delineation of

14  a specific structure, nor the identification of structure distinct from its function, is required to

15  escape § 112 ¶ 6.  Id. at 1359-60.  What is required to escape § 112 ¶ 6 is that the phrase

16  be used in common parlance or by persons of skill in the pertinent art to designate structure,

17  even if the structure described is of a broad or amorphous class.

18         This Court believes that Lighting World controls and that "flexible connecting device"

19  does in fact connote such a structure.  This Court cannot distinguish between the "connector

20  assembly" of Lighting World and the "flexible connecting device" of the present case.  Just

21  as that court found that "connector" had a reasonably understood meaning as a name for

22  structure (noticeably, not a structure), despite the fact that this structure was defined in terms

23  of the function that it performs, so does this Court find "connecting device" to connote

24  structure.  Admittedly, there is a distinction in the terms, in that the term "connector" is a noun

25  whereas "connecting" is an adjective describing the function of the generic phrase "device,"

26  however the Court finds this to be a distinction without difference.  Absent any evidence on

27  the issue, this Court cannot see any substantial difference between a person of ordinary skill

28  in the art of lighting fixtures describing something as a "connector assembly" and a person

13

1   of ordinary skill in the art of small motorized devices describing something as a "connecting

2   device."

3      Additionally, the factors present in <u>MIT</u>, which the Federal Circuit relied upon to

4   construe "colorant selection mechanism" as a means-plus-function element, are not present

5   in this instance.  The prosecution history of the '448 patent lacks any synonymous usage of

6   the terms "device" and "means," and the term "connecting" (which modifies "device") is

7   clearly defined in common knowledge and dictionaries.  Thus, the term "connecting device,"

8   in the context of this patent, connotes a sufficient degree of structure to one of ordinary skill

9   in the art so as to avoid § 112 ¶ 6.

10      Furthermore, this Court gives consideration to the fact that the presumption against

11   construing an element as means-plus-function stems from the premise that § 112 ¶ 6 affords

12   the patentee the *option* of using the means-plus-function format.  <u>Greenberg</u>, 91 F.3d at

13   1584.  In light of this fact, an important distinction within the patent becomes apparent.  Claim

14   10 is dependent upon Claim 1, and further limits the "flexible connecting device" of Claim 1:

15      [W]herein said connecting device comprises an elongate flexible member,
       first flexible connecting means at one end of said flexible member for flexibly
16      connecting it to the free end of said elongate member, and second
       connecting means at the opposite end of said flexible member for connecting
17      it to the object to suspend it below the free end of said elongate member.

18   ('448 patent, column 4, line 50-57.)  It is clear from Claim 10 that the patentee was indeed

19   familiar with the means-plus-function terminology, and the method of exercising his option

20   to invoke § 112 ¶ 6, as he added the limitations of a "first flexible connecting *means"* and a

21   "second connecting *means.*"  It seems to this Court that if the patentee wished to exercise

22   this option in claim 1, he would have done so in the same manner.  In light of this

23   inconsistency, the Court does not believe that the patentee exercised his option to invoke §

24   112 ¶ 6 in this element of Claim 1.

25      As the Court has determined that § 112 ¶ 6 does not apply, and the words of the

26   phrase are commonly understood, the Court does not believe that "**flexible connecting**

27

28

14

1  **device**" requires any additional construction.[6]

2

3  K.  "an object attached to said connecting device **opposite and directly below the**

4  **free end of said member**;"

5  The Court finds that the words used in describing the placement of the object do not

6  require any definition.  The Court construes the phrase "**opposite and directly below the**

7  **free end of said member**" to simply mean "on the opposite side of the connecting device

8  from the elongate member, and also directly below the free end of said member."

9

10  L.  "**drive means** on said base member for rotating said elongate member to move

11  said object in a path around said base for the amusement of a pet unsecured to said base;"

12  The parties stipulate that this is a means-plus-function element, and it shall be

13  construed as such.  In <u>Cardiac Pacemakers</u>, the Federal Circuit synthesized the law

14  governing construction of means-plus-function elements as follows:

15  Construction of a means-plus-function limitation involves two steps. First, the
   court must identify the claimed function. *Telemac Cellular Corp. v. Topp*
16  *Telecom, Inc.*, 247 F.3d 1316, 1324, 58 U.S.P.Q.2D (BNA) 1545, 1549 (Fed.
   Cir. 2001) (citing *Kemco*, 208 F.3d at 1361, 54 U.S.P.Q.2D (BNA) at 1610);
17  *Micro Chem., Inc. v. Great Plains Chem. Co., Inc.*, 194 F.3d 1250, 1258, 52
   U.S.P.Q.2D (BNA) 1258, 1263 (Fed. Cir. 1999). The court must construe the
18  function of a means-plus-function limitation to include the limitations
   contained in the claim language, and only those limitations. *Lockheed Martin*,
19  249 F.3d at 1324, 58 U.S.P.Q.2D (BNA) at 1678. It is improper to narrow the
   scope of the function beyond the claim language. *Id.* It is equally improper to
20  broaden the scope of the claimed function by ignoring clear limitations in the
   claim language. *Id.* Ordinary principles of claim construction govern
21  interpretation of the claim language used to describe the function. *Id.*

22  After identifying the claimed function, the court must then determine what
   structure, if any, disclosed in the specification corresponds to the claimed
23  function. *Id.* In order to qualify as corresponding, the structure must not only
   perform the claimed function, but the specification must clearly associate the
24  structure with performance of the function. *Medtronic*, 248 F.3d 1303, 1311,
   58 U.S.P.Q.2D (BNA) 1607, 1614 (quoting *B Braun Med., Inc. v. Abbott*
25  *Labs.*, 124 F.3d 1419, 1424, 43 U.S.P.Q.2D (BNA) 1896, 1900 (Fed. Cir.
   1997)). This inquiry is undertaken from the perspective of a person of
26  ordinary skill in the art. *Atmel Corp. v. Info. Storage Devices, Inc.*, 198 F.3d
   1374, 1378-79, 53 U.S.P.Q.2D (BNA) 1225, 1227-28 (Fed. Cir. 1999).

27

28  _____

   [6] Defendants have requested that "single" be construed as "only one."  However, the
   Court finds that the word "single" is readily understood and requires no further definition.

15

1

2

3

4

5

> Alternative embodiments may disclose different corresponding structure, and the claim is valid even if only one embodiment discloses corresponding structure. *See Ishida Co. v. Taylor*, 221 F.3d 1310, 1316, 55 U.S.P.Q.2D (BNA) 1449, 1452-53 (Fed. Cir. 2000). If, however, this inquiry reveals that no embodiment discloses corresponding structure, the claim is invalid for failure to satisfy the definiteness requirement of § 112, P 2. *Budde v. Harley-Davidson, Inc.*, 250 F.3d 1369, 1376, 58 U.S.P.Q.2D (BNA) 1801, 1806 (Fed. Cir. 2001) (citing *In re Dossel*, 115 F.3d 942, 945, 42 U.S.P.Q.2D (BNA) 1881, 1884 (Fed. Cir. 1997)).

6

<u>Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc.</u>, 296 F.3d 1006, 1113-14 (Fed. Cir. 2002).

7

8

9

10

11

12

13

14

In this instance, the first step of construction, identifying the claimed function, is clear. Claim 1 states the function is "for rotating said elongate member to move said object in a path around said base for the amusement of a pet unsecured to said base." ('448 patent, column 4, line 12-15.)   Defendants' contention that the function should be construed as requiring that the object be dragged on the ground, relying on language in the specification, is mistaken.  The function is clearly defined in the language of the claim, and this Court "must construe the function of a means-plus-function limitation to include the limitations contained in the claim language, and only those limitations."  <u>Cardiac Pacemakers</u>, 296 F.3d at 1113.

15

16

17

18

19

20

The second step in construction is similarly clear.  From column 2, line 67 to column 3, line 20, and in Figure 4, the patent delineates the corresponding structural components of the drive means: a power supply 27, a switch 26, a motor 32, reduction gears 36, and a shaft 18.  The specification clearly associates the structure with performance of the function in that the paragraph describing the drive means begins: "The drive assembly 24 is illustrated in more detail in FIG. 4." ('448 Patent, column 2, line 67.)

21

22

As such, the phrase "**drive means**" shall be construed to mean "a power supply, a switch, a motor, reduction gears, and a shaft."

23

24

**III.    Construction of the Terms of the '448 Patent: Claim 3**[7]

25

26

Claim 3 is dependent upon, and incorporates all of the elements of, Claim 1.  The Court addresses the following term of Claim 3 of the '448 patent:

27

28

---

[7] Plaintiff has indicated that any claim of infringement with respect to Claim 2 is withdrawn and, therefore, no construction is necessary. [<u>See</u> Doc. #60, Ex. A at 5.]

05CV1688

1
2
      The device as claimed in claim 1, wherein said elongate member comprises a **pliable** wire.

3
4
      The parties stipulate that "**pliable**" means "bendable."  The Court shall construe it as such.

5

6
### IV.    Construction of the Terms of the '448 Patent: Claim 4

7
8
      Claim 4 is dependent upon, and incorporates all of the elements of, Claim 1.  The Court addresses the following three terms of Claim 4 of the '448 patent:

9
10
11
12
      The device as claimed in claim 1, wherein said drive means comprises a power supply, a drive motor mounted in said base, [1] **circuit means** connecting said power supply to said drive motor, [2] a **rotatable member rotatably mounted** on said base, said elongate member being releasably secured to said rotatable member, and [3] **transmission means** connecting said drive motor to said rotatable member.

13
      A.  "**circuit means** connecting said power supply to said drive motor"

14
15
16
17
      The parties stipulate that this is a means-plus-function element, thereby invoking § 112 ¶ 6.  As such, the Court applies the <u>Cardiac Pacemakers</u> two-step construction method whereby the first step is identifying the claimed function, and the second step is determining what corresponding structure is identified in the patent specification.  296 F.3d at 1113-14.

18
19
20
      In this instance, the parties stipulate that: 1) the function is to connect said power supply to said drive motor; and 2) the corresponding structure disclosed in the specification is a switch and a speed control.

21
22
      The Court adopts this construction, and shall construe the term "**circuit means**" as "a switch and a speed control."

23

24
25
      B.  "a **rotatable member rotatably mounted** on said base, said elongate member being releasably secured to said rotatable member"

26
27
28
      The parties stipulate that "**rotatable member**" means "a shaft that rotates for connection to the elongate member."  The Court shall construe it as such.  The Court also deems it necessary to construe the term "rotatably mounted" as that term is not one often

17

1  found in common parlance.  As "rotatably" is an adverb form of the word "rotate," the Court

2  shall construe **"rotatably mounted**" to mean, "mounted in a way such that it is capable of

3  being rotated."

4

5    C.  "**transmission means** connecting said drive motor to said rotatable member."

6    The parties stipulate that this is a means-plus-function element, thereby invoking §

7  112 ¶ 6.  In this instance, the parties stipulate that: 1) the function is to connect the drive

8  motor to said rotatable member; and 2) the corresponding structure disclosed in the

9  specification is a reduction gear.

10    The Court modifies this construction slightly, in that the specification discloses multiple

11  reduction gears ('448 patent, column 3, lines 4-7), and shall construe the term "transmission

12  means**" as "reduction gears."  For further clarification, it is useful to define "reduction gears,"

13  which may be defined as "gearing that reduces an input speed to a slower output speed."[8]

14  Thus, the Court construes the phrase "**transmission means**" as "reduction gears that

15  operate to reduce an input speed to a slower output speed."

16

17  **V.    Construction of the Terms of the '448 Patent: Claim 5**

18    Claim 5 is dependent upon, and incorporates all of the elements of, Claim 4 (and

19  thereby Claim 1).  The Court addresses the following two terms of Claim 5 of the '448 patent:

20    The device as claimed in claim 4, wherein said circuit means includes [1]
      **switch means** for controlling connection of the power supply to the motor, said
21    switch means including [2] an **actuator externally mounted on said base** for
      controlling operation of said switch means.
22

23    A.  "**switch means** for controlling connection of the power supply to the motor"

24    The parties stipulate that this is a means-plus-function element, thereby invoking §

25  112 ¶ 6.  In this instance, the parties stipulate that: 1) the function is for controlling connection

26  of the power supply to the motor; and 2) the corresponding structure disclosed in the

27  specification is a switch.

28

---

[8] WordNet 3.0, available at http://dictionary.reference.com/browse/reduction%20gear.

05CV1688

1    The Court adopts this construction, and shall construe the term "**switch means**" as

2    "a switch."

3

4        B.  "said switch means including an **actuator externally mounted on said base** for

5    controlling operation of said switch means"

6        The parties stipulate that "**actuator externally mounted on said base**" means "a

7    switch button on the outside of the base."  The Court shall construe it as such.

8

9    **VI.**    **Construction of the Terms of the '448 Patent: Claim 6**

10       Claim 6 is dependent upon, and incorporates all of the elements of, Claim 4 (and

11   thereby Claim 1).  The Court addresses the following term of Claim 6 of the '448 patent:

12       The device as claimed in claim 4, wherein said circuit means includes **variable
         speed control means** for controlling the speed of rotation of said rotatable
13       member.

14       The parties stipulate that this is a means-plus-function element, thereby invoking §

15   112 ¶ 6.  As such, the Court applies the <u>Cardiac Pacemakers</u> two-step construction method

16   whereby the first step is identifying the claimed function, and the second step is determining

17   what corresponding structure is identified in the patent specification.  296 F.3d at 1113-14.

18   If no corresponding structure is found in the specification, the claim is invalid for failure to

19   satisfy the definiteness requirement of § 112 ¶ 2.[9] <u>Id.</u> (citing <u>Budde v. Harley-Davidson, Inc.</u>,

20   250 F.3d 1369, 1376 (Fed. Cir. 2001)).  The determination of whether the specification

21   adequately delineates a corresponding structure is made from the viewpoint of one skilled

22   in the art.  <u>Budde</u>, 250 F.3d at 1376.  Additionally, because the claims of a patent are

23   afforded a statutory presumption of validity, the finding that a means-plus-function claim is

24   invalid for indefiniteness must be proven by clear and convincing evidence.  <u>Id.</u>  "Thus, a

25   challenge to a claim containing a means-plus-function limitation as lacking structural support

26   requires a finding, by clear and convincing evidence, that the specification lacks disclosure

27   _____

28   [9] 35 U.S.C. § 112 ¶ 2 states: "The specification shall conclude with one or more claims
     particularly pointing out and distinctly claiming the subject matter which the applicant regards
     as his invention."

                                    19                                    05CV1688

of structure sufficient to be understood by one skilled in the art as being adequate to perform the recited function." Id. at 1376-77.

In this case, the function of the element is clear from the language of the claim in that it is "for controlling the speed of rotation of said rotatable member." However, the parties disagree as to the corresponding structure disclosed in the specification. Defendants argue that no corresponding structure is disclosed and thus the claim is invalid for indefiniteness under § 112 ¶ 2. In opposition, Plaintiff points to column 3, line 11 of the specification which states, "a variable speed control 38 may be provided to allow the speed of movement of object 22 to be varied, for example from 5 to 25 r.p.m." The speed control is also illustrated as item 38 in the schematic drawing of Figure 4.

The Court finds enough structure in the specification's use of the term "variable speed control," taken in context with Figure 4, and in light of the expected level of ordinary skill in the art, to satisfy Section 112. Though the '448 patent somewhat clumsily defines the means-plus-function element of "variable speed control means" as "a variable speed control," the fact that the speed control is depicted in Figure 4 as being part of the circuit connecting the power supply to the motor impliedly limits the structure of the speed control to an electronic device. Therefore, Defendants' contention that no structure is disclosed in the specification is incorrect. Additionally, there is some evidence suggesting that a speed control is a fungible electronic device that may be acquired from numerous distributors in the small electronic device market.[10] Thus, in light of the presumption of validity, this Court holds that Defendants have not provided clear and convincing evidence that the structure provided in the specification, though admittedly sparse, is inadequate to a degree which would render the claim invalid.

---

[10] While Plaintiff did not provide evidence supporting the proposition that one of ordinary skill in the art would recognize the structure of a variable speed control, an internet search for the term "variable speed control" returned many references to small electronic components capable of varying the speed of an assortment of motorized devices. See, e.g., IMS's variable speed control products, shown at http://www.imshome.com/osc.html. Plaintiff's references to the Comerford Patent (US Patent No. 6,892,675) were unilluminating in regard to the element of a variable speed control because the referenced section describes a timing device, and not a speed control.

20

1    As such, the Court shall construe "**variable speed control means**" as "an electronic

2 device capable of varying the speed of an object."

3

4 **VII.    Construction of the Terms of the '448 Patent: Claim 7**

5    Claim 7 is dependent upon, and incorporates all of the elements of, Claim 6 (and

6 thereby Claims 1 and 4).  The Court addresses the following term of Claim 7 of the '448

7 patent:

8    The device as claimed in claim 6, including **control means** for intermittently
   varying the speed of said rotatable member.

9

10    The parties stipulate that this is a means-plus-function element, thereby invoking §

11 112 ¶ 6.  The function of this element is clear from the language of the claim: "for

12 intermittently varying the speed of said rotatable member."  However, the parties disagree

13 as to the corresponding structure disclosed in the specification.  Defendants argue that no

14 corresponding structure is disclosed and thus the claim is invalid for indefiniteness under

15 Section 112 ¶ 2.  In opposition, Plaintiff points to column 3, line 16, of the specification, which

16 states: "Also illustrated in FIG. 4 is an optional timer 40 for periodically turning the motor on

17 and off, so the object 22 will be stopped and re-started periodically, for example at 5, 10, or

18 15 minutes."  Plaintiff argues that this timer is the corresponding structure which serves the

19 function of intermittently varying the speed of the rotatable member.  It appears to the Court

20 that this assertion is incorrect, and is better made in regard to Claim 8, as Claim 7 deals with

21 intermittently varying the speed and not intermittently turning the device on and off.  The

22 Court finds that the structure corresponding to the language of Claim 7 is found in column

23 3, line 13, which states: "[The variable speed control] may be manually operated by a suitable

24 external control, or a timer for automatically varying the speed periodically may be included."

25 Though Plaintiff has put forth no evidence suggesting that a person of ordinary skill in the art

26 would be familiar with the structure of a timer or suitable external control for intermittently

27 varying the speed, the Court finds that such a person in this instance would be able to

28 understand the disclosed structures.  It is apparent that one of ordinary skill in the art of small

21

1    motorized devices would be familiar with timers or other external components for periodically

2    varying the speed of the device, in conjunction with the variable speed control of Claim 6.

3    Again, in construing the terms of a patent there is a presumption of validity and, in this

4    instance, Defendants have not provided clear and convincing evidence that the structures

5    provided in the specification are inadequate to a degree which would render the claim invalid.

6        As such, the Court shall construe the phrase "**control means**" as "a timer or external

7    control."

8

9    **VIII.    Construction of the Terms of the '448 Patent: Claim 8**

10       Claim 8 is dependent upon, and incorporates all of the elements of, Claim 6 (and

11   thereby Claims 1 and 4).  The Court addresses the following term of Claim 8 of the '448

12   patent:

13       The device as claimed in claim 6, including **control means** for intermittently
         turning said motor on and off and for varying the speed of said rotatable
14       member at varying intervals.

15       The parties stipulate that this is a means-plus-function element, thereby invoking §

16   112 ¶ 6.  The function is clear from the language of the claim: "for intermittently turning said

17   motor on and off and for varying the speed of said rotatable member at varying intervals."

18   Defendants again argue that no corresponding structure is disclosed in the specification.

19   However, as was discussed above in reference to Claim 7, this is not the case.  For the

20   function of "varying the speed of said rotatable member at varying intervals," the

21   corresponding structure is that described above - an "external control, or a timer."  (Column

22   3, line 14.)  The disclosed structure corresponding to the function of "intermittently turning

23   said motor on and off" is found in the next sentence of the specification (Column 3, line 16)

24   which states: "Also illustrated in FIG. 4 is an optional timer 40 for periodically turning the

25   motor on and off, so the object 22 will be stopped and re-started periodically, for example at

26   5, 10, or 15 minutes."  Again, though Plaintiff has failed to set forth evidence tending to show

27   that a person of ordinary skill in the art of small motorized devices would understand the

28   structure of such a timer, the Court finds it obvious that such a person would so understand.

1   Defendants have not provided clear and convincing evidence that the structures provided in

2   the specification are inadequate to a degree which would render the claim invalid.

3       As such, the Court shall construe the phrase "**control means**" in the context of Claim

4   8 to mean "two timers or a timer and external control."

5

6   **IX.**    **Construction of the Terms of the '448 Patent: Claim 10**[11]

7       Claim 10 is dependent upon, and incorporates all of the elements of, Claim 1.  The

8   Court addresses the following two terms of Claim 10 of the '448 patent:

9       The device as claimed in claim 1, wherein said connecting device comprises
        an elongate flexible member, [1] **first flexible connecting means** at one end
10      of said flexible member for flexibly connecting it to the free end of said elongate
        member, and [2] **second connecting means** at the opposite end of said
11      flexible member for connecting it to the object to suspend it from the free end
        of said elongate member.

12

13      A.  "**first flexible connecting means** at one end of said flexible member for flexibly

14  connecting it to the free end of said elongate member"

15      The parties stipulate that "first flexible connecting means" is a means-plus-function

16  element, thereby invoking § 112 ¶ 6. The function of the element is clear from the language

17  of the claim: "for flexibly connecting [one end of said flexible member] to the free end of said

18  elongate member."  Once again, the dispute arises in regard to the corresponding structure

19  disclosed in the specification.  Plaintiff suggests that the disclosed structure is "releasably

20  attaching the end of the connecting device to the elongated member (column 2, line 45)."

21  However, the Court cannot interpret this phrase as connoting structure - a flexible connecting

22  means is not structurally defined by describing the type, and not structure, of attachment.

23  Defendants contend that the only corresponding structure disclosed in the specification is the

24  "rubber sleeve" (29) discussed at column 2, line 66.  However, this rubber sleeve alone, in

25  the context of the patent, is not the first flexible connecting means as it is apparent that this

26  sleeve is a hollow tube that does not itself provide a means for connection.  (See '448 Patent,

27

28      [11] Claim 9 has not been briefed and appears not to be in issue.  Accordingly, the Court
        determines that no construction is necessary.

05CV1688

Column 2, Lines 64-66: "Loop 28 was also a nylon soft cord secured to the free end of wire 20 *within* rubber sleeve 29." (emphasis added).)

The Court finds the corresponding structure to be the loop (28) at the free end of the elongate member as disclosed in column 2, lines 46 and 64.  The loop works in conjunction with the rubber sleeve to fasten the elongate member (wire) to the flexible member (string). Accordingly, the Court construes the phrase "**first flexible connecting means**" as "a loop and rubber sleeve."

B.  "**second connecting means** at the opposite end of said flexible member for connecting it to the object to suspend it from the free end of said elongate member"

The parties stipulate that "second connecting means" is a means-plus-function element, thereby invoking § 112 ¶ 6.  Defendants assert, and the Court agrees, that no corresponding structure is found in the specification for the "second connecting means" and thus Claim 10 is invalid for indefiniteness under the Budde rationale.  Plaintiff asserts that "the corresponding structure disclosed in the patent specification for performing the function is an object secured to the wire by a string (column 2, line 27) to hang below the end of the elongated member."  Again, this reasoning is flawed.  The corresponding structure for a connecting means cannot be "an object secured to the wire by a string," as the act of securing an object by a string does not denote the structure on the flexible member (string) for securing the object, such as exists with the loop 28 and rubber sleeve 29.

Simple arithmetic reveals that there are not enough elements disclosed in the specification to provide a corresponding structure for the second connecting means.  This is because Claim 10 requires the connecting device to reference five elements: the elongate member of Claim 1, an elongate *flexible* member, a first flexible connecting means for connecting the flexible member to the elongate member, the object of Claim 1, and a second connecting means for connecting the flexible member to the object.  However, there are only four structures disclosed regarding this facet of the invention: the elongate member, a string, a loop/rubber sleeve, and the object.  The elongate member and object of Claim 1 are clearly

05CV1688

disclosed.  As discussed above, the first flexible connecting means is the "loop and rubber sleeve."  The flexible member is disclosed in the preferred embodiment as the "string" (23), which must be distinguished from the "cord," "rod," or "wire" of the elongate member.  However, there are no structural elements remaining for specification as the second connecting means.  The argument that a person of ordinary skill in the art would recognize the language of column 2, lines 28-31 – "[a]n object 22 . . . is secured to the free end of the wire 20 via a length of string 23" – as impliedly providing the structure of a knot in the string is not enough to meet the requirements of § 112 ¶ 6 in conjunction with § 112 ¶ 2.  This disclosure not only fails to provide the requisite corresponding structure, but it also does not clearly associate the structure with performance of the function.  See Medtronic, Inc. v. Advanced Cardiovascular Sys., Inc., 248 F.3d 1303, 1311 (Fed. Cir. 2001).

As such, the Court deems Claim 10 **invalid for indefiniteness**, in that no corresponding structure is disclosed in the specification for the means-plus-function element of a "**second connecting means**."

## X.    Construction of the Terms of the '448 Patent: Claim 11

Claim 11 is an independent claim.  Many of the terms therein have been construed above, and require no further construction.  The Court addresses the following five terms of Claim 11 of the '448 patent:

> A device [1] **for the amusement of pet animals free and untethered to the device**, the device comprising: [2] **a base member having a lower edge for seating freely on the ground, the lower edge lying in a substantially flat plane and having no protrusions projecting downward from said plane**; an elongate, pliable member having a first end rotatably mounted on said base member, said elongate member extending in an arched path upwardly and outwardly away from said base member with the free end of said elongate member being spaced outwardly from the outer periphery of said base member; [3] **a connecting loop** at the free end of said elongate member; a connecting line secured at one end to said connecting loop; a toy object secured to the opposite end of said connecting line for suspension [4] **directly downwardly** from the free end of said elongate member; drive means in said housing for rotating said one end of said elongate member to drive its free end in a path around said base member, said drive means including a drive motor and a switch means for controlling actuation of said drive motor; said switch means including an [5] **actuator** on the outside of said housing for switching said motor on and off; and transmission means for connecting said drive motor to said one end of said elongate member.

A.    "A device **for the amusement of pet animals free and untethered to the device**"

As discussed in regard to the preamble of Claim 1, Plaintiff relied upon the preamble during prosecution to distinguish the claimed invention from the Postings and McMurry references, thereby requiring deviation from the general rule against construing preambles as limiting claim elements.  See Catalina, 289 F.3d at 808-809.  Statements of intended use may limit the claims in those instances where the patentee "clearly and unmistakably relied on those uses or benefits to distinguish prior art."  Id. at 809.

In this instance, Plaintiff clearly relied on the "free and untethered" clause of the preamble to distinguish from the Postings and McMurry references when, in a response to the USPTO examiner's initial rejection, he stated:

> [W]ith [the Postings] exercising device the dog is tethered to the device and enticed with food or the like to run in a circle around the base.  In contrast, no such incentive is provided in McMurry, where one or more dogs are tethered along arm 80 . . . . [T]he device in both Postings and McMurry is clearly not for the free amusement of a pet unsecured to the device, but for the tethering and forced or encouraged exercising of a dog.

(Def's Ex. B at 35-37 (emphasis in original).)  Thus, the Court will construe the preamble phrase "**a device for the amusement of pet animals free and untethered to the device**" as "a device for the amusement of an animal kept for pleasure or companionship, rather than solely for utility, in which the animal is free and untethered to the device."

B.    "**a base member having a lower edge for seating freely on the ground, the lower edge lying in a substantially flat plane and having no protrusions projecting downward from said plane**"

In briefing their proposed constructions of this phrase, neither party appears to have accounted for all of the differences in language employed in Claim 11, as opposed to Claim 1.  The Court, however, feels that Patentee's different choice of language to describe the base member in Claim 11 is important and must be given effect in construing the claim.  The differences are subtle, but significant.  To wit, in Claim 1, the base member has a lower

05CV1688

*surface* for freely seating *on* a substantially flat *surface;* and that lower *surface* has no *projections for connection to the seating surface*.  In Claim 11, the base member has a lower *edge* for freely seating on the *ground*; that lower *edge lying in* a substantially flat *plane* and having no *protrusions projecting downwardly from said plane*.

The Court finds that the difference between "edge" and "surface" is not significant.[12] However, Claim 11's edge freely sits on the ground, not any substantially flat surface.  The ground, which is defined as the "solid surface of the earth," while flat in places, can be significantly uneven or irregular.  Accordingly, as in Claim 1, the lower edge of the device would not necessarily be flat itself.  This construction, however, ignores the crucial additional phrase of Claim 11: "the lower edge lying in a substantially flat plane."  Neither party has briefed the meaning of this phrase.  A plane is defined as "an unbounded two-dimensional shape" or "a surface containing all the straight lines that connect any two points on it."[13]  As it is a two-dimensional shape, it is perfectly regular and flat, though not necessarily horizontal.  A *substantially flat* plane, then, is one that is mostly horizontal.[14]  As the lower edge lies *in* the plane, not *on* it, all of the points on the lower edge must be regularized and, thus, the edge itself must be flat.  The Court, therefore, finds that the lower edge must be a flat surface that lies mostly horizontal on the ground.

Claim 11 also refers to the absence of any protrusions from the lower edge, which would project downwardly from the mostly horizontal plane.  Claim 1 referred to *projections*, not protrusions – a distinction the Court considers immaterial – but also referred to the purpose of the projections, i.e., for connection to the seating surface.  No such limitation exists in Claim 11.  Accordingly, the device in Claim 11 does not contain any part that

---

[12] American Heritage Dictionary defines "edge," as used in the context of the '448 patent, as: "the line of intersection of two surfaces."

[13] WordNet 3.0, available at http://dictionary.reference.com/browse/plane and American Heritage Dictionary.  American Heritage Dictionary also defines "plane" as "a flat or level surface," though use of this definition seems inappropriate because it would render Patentee's inclusion of "flat" superfluous.

[14] American Heritage Dictionary defines "flat" as: "having a horizontal surface without a slope, tilt, or curvature."

05CV1688

1  protrudes out from the lower edge of the device and proceeds downward, regardless of its

2  intended purpose.

3      The Court therefore construes "**a base member having a lower edge for seating**

4  **freely on the ground, the lower edge lying in a substantially flat plane and having no**

5  **protrusions projecting downward from said plane**" as "a supporting structural unit having

6  a flat lower edge for sitting on, unsecured to, the ground in a mostly horizontal position.  This

7  unit shall have no parts extending downward from its lower edge."

8

9      C.  "a **connecting loop** at the free end of said elongate member"

10      Defendants suggest a construction of this term to require that the loop be "secured

11  to and extending from the outermost end of the elongate member," and points to a statement

12  made by Plaintiff during prosecution as support: "Neither of the main references shows or

13  suggest a connecting loop at the free end of an elongate, pliable member, from which a toy

14  object is suspended via a connecting line." (Def's Ex. B at 40-41.)   Since the claim already

15  includes the limitation "at the free end of said elongate member" – the language actually

16  employed in the prosecution history – the Court finds no need to construe the term as limiting

17  the connecting loop only to one placed at the "outermost end of the elongate member."

18  Defendants' contention that the prior art references disclosed an assortment of loops may

19  be true, but Plaintiff did not rely on his connecting loop to distinguish from these references,

20  except as mentioned above, and the claim is limited as such.  Thus, the term will not be

21  construed with the limitation Defendants suggest.

22

23      D.  "a toy object secured to the opposite end of said connecting line for suspension

24  **directly downwardly** from the free end of said elongate member"

25      Defendants suggest construing this term to mean "directly beneath the free end of the

26  elongate member."  The Court, however, finds that the phrase is readily understood.  Thus,

27  the term shall not be construed.

28

28

E. "an **actuator** on the outside of said housing for switching said motor on and off;"

The parties stipulate that "**actuator**" means "a switch button."   The Court shall construe it as such.

## XI.   Construction of the Terms of the '448 Patent: Claim 12

Claim 12 is an independent method claim.  Many of the terms therein have been construed above and require no further construction.  The Court addresses the following three terms of Claim 12 of the '448 patent:

> [1] **A method for amusing pet animals**, [2] **comprising the steps of**: **seating** a base member freely on the ground surface; **suspending** a toy object from the free end of an elongate pliable member with the other end rotatably mounted to the base member; and **driving** the elongate member to rotate and move the toy object [3] **in a path** around the base member to attract the attention of a pet animal free and unsecured to the elongate member.

### A. "**A method for amusing pet animals**"

The analysis of this preamble mirrors that of Claims 1 and 11, in that Plaintiff relied upon the amusement element to avoid prior art references during prosecution, and shall be limited by this.  Accordingly, the preamble phrase "**a method for amusing pet animals**" shall be construed as: "A method for the amusement of an animal kept for pleasure or companionship, rather than solely for utility."

### B. "**comprising the steps of: seating** . . . ; **suspending** . . .; and **driving** . . . ."

Plaintiff argues that each of the three steps in this method claim (seating, suspending, and driving) require specialized construction as step-for-function elements under 35 U.S.C. § 112 ¶ 6.[15]  The analysis of such elements is similar to that applied to means-plus-function elements, and would be limited by the detail provided in the specification.  Defendants contend that these elements require no construction at all.

---

[15] 35 U.S.C. § 112 ¶ 6 states: "An element in a claim for a combination may be expressed as a means *or step for performing a specified function* without the recital of structure, material, or *acts* in support thereof, and such claim shall be construed to cover the corresponding structure, material, or *acts* described in the specification and equivalents thereof." (emphasis added).

05CV1688

1    Determining whether a claim invokes the step-for-function application of § 112 ¶ 6 has

2    been explained by the Federal Circuit accordingly:

3

4    > Method claims necessarily recite the steps of the method, and the preamble words that "the method comprises the steps of" do not automatically convert each ensuing step into the form of § 112 P6. Nor does the preamble usage

5    > "steps of" create a presumption that each ensuing step is in step-plus-function form; to the contrary, the absence of the signal "step for" creates the

6    > contrary presumption.

7    Cardiac Pacemakers, Inc. v. St. Jude Medical, Inc., 381 F.3d 1371, 1382 (Fed. Cir. 2004).

8    Accordingly, this Court determines that the inclusion of the phrase "comprising the steps of"

9    does not convert the elements of this method claim into steps-for-function.  Thus, the steps

10   of the method (seating, suspending, and driving) are construed the same as any other claim

11   element.   The Court finds that these words are readily understood and, therefore, no

12   construction is required.

13

14   C.  "driving the elongate member to rotate and move the toy object **in a path** around

15   the base member"

16   Defendants cite to various passages of the specification for the proposition that this

17   step of Claim 12 should be construed as meaning "to drag the object on the ground in a path

18   around the base."  However, reading such a limitation into the claim language would mean

19   committing "'one of the cardinal sins of patent law' -- reading specific limitations in a

20   specification's disclosed embodiment into the broader claim."  Cardiac Pacemakers, Inc. v.

21   St. Jude Medical, Inc., 418 F. Supp. 2d 1021, 1029 (S.D. Ind. 2006) (citing Phillips, 415 F.3d

22   at 1320, 1323).   It is clear that in the preferred embodiment of the device, and the

23   accompanying method, the object would be dragged along the ground.  (See, e.g., '448

24   Patent Abstract ("object . . . is *preferably* arranged to be dragged along the ground");

25   Summary of Invention at Column 1, Line 36 ("object may be directly secured to the free end

26   of the wire but is *preferably* secured to it by a length of string so that it is dragged along on

27   the ground"); Description of *Preferred* Embodiment at Column 2, Line 38 ("[t]he cord or wire

28   is of sufficient length to enable object 22 to be dragged along the ground") and Column 3,

30

1  Line 45 ("In order to operate the toy device, the motor is actuated and the wire 20 will then

2  be rotated, dragging object 22 on the ground in a path around housing 12.") (emphasis

3  added).)  However, it is equally clear that the "claim language, specification, and prosecution

4  history do not disclaim" all other embodiments of the device, or methods, in which the object

5  is not dragged along the ground.  <u>Cardiac Pacemakers</u>, 418 F. Supp. 2d at 1029; <u>see</u> <u>also</u>

6  <u>Phillips</u>, 415 F. 3d at 1323 ("[W]e have expressly rejected the contention that if a patent

7  describes only a single embodiment, the claims of the patent must be construed as being

8  limited to that embodiment.")  The use of the phrase "preferably" would be rendered

9  superfluous if other possible arrangements (in which the object was not dragged on the

10 ground) were not included within the claimed invention.  As such, the Court declines to

11 construe this element as requiring the object to be dragged on the ground.

12

13 **XII.**   **Conclusion**

14      The terms of the '448 patent shall be construed as described above.

15

16 **IT IS SO ORDERED.**

17

18 DATED:  September 19, 2007

19

20                              Honorable Barry Ted Moskowitz
                                United States District Judge

21

22

23

24

25

26

27

28

31

05CV1688